**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISON**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CAUSE NO. EP:22-CR-1944-KC** |
| | § | |
| **DANIEL TOHME POSADA,** | § | |
|    Defendant. | § | |

**DEFENDANT'S MOTION TO DISMISS INDICTMENT**

COMES NOW Defendant, Daniel Tohme Posada ("Tohme"), by and through counsel, and, pursuant to the Fifth Amendment to the United States Constitution and Federal Rule of Criminal Procedure 12(b)(2), respectfully asks the Court to dismiss his Indictment in light of the decisions in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843, --- S. Ct. ---, 2022 WL 2251305 (June 23, 2022); *United States v. Quiroz*, PE:22-CR-00104-DC, (W.D. Tex. Sep. 19, 2022); and *United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023).

Tohme shows as follows:

**FACTUAL BACKGROUND**

1.    The government's case is premised on the following factual allegations which, for purposes of this motion only, Tohme stipulates to be true:

2.    On April 22, 2020[1], Tohme was charged by Indictment with the offense of Manslaughter, in violation of Texas Penal Code 19.04, a crime punishable by imprisonment for a term exceeding I year.  The case was assigned to the 168th Judicial District Court of El Paso County, Texas, under the caused numbered: 20200D01762. *See* Ex. A.

---

[1] The Indictment incorrectly states the date of the indictment as "April 22, 2022," which is facially wrong and which Tohme reserves the right to contest at Trial, should such be necessary.

3.      On November 15, 2022, while awaiting trial on the foregoing case, Tohme was arrested, and a Criminal Complaint was filed against him for violating 18 U.S.C. § 922(n).  ECF No. 1.

4.      On December 7, 2022, while still awaiting trial on the foregoing state case, Tohme was indicted for Illegal Receipt of Ammunition[2] by a Person Under Indictment, in violation of 18 U.S.C. § 922(n) and 924(a)(1)(D).  ECF No. 13.

5.      In the meantime, two cases were decided that directly affect Tohme's 18 U.S.C. § 922(n) charge.

6.      On June 23, 2022, the United States Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843, --- S. Ct. ---, 2022 WL 2251305 (June 23, 2022).  In *Bruen* the Supreme Court rejected the two-step framework employed by this Court for Second Amendment challenges, in favor of a simpler formulation. Under the new text, a court need only conduct the first step of the prior framework: whether the plain text of the Second Amendment protects the conduct at issue and whether the Government has demonstrated the regulation is consistent with the historical traditions of the United States. *See id*. at *8

7.      On September 19, 2022, on the footsteps of *Bruen*, the United States District Court for the Western District of Texas, Honorable Judge David Counts, decided *United States v. Quiroz*, PE:22-CR-00104-DC, 7n.28 (W.D. Tex. Sep. 19, 2022). In *Quiroz*, the Western District of Texas held that 18 U.S.C. § 922(n) is unconstitutional.

---

[2] The instant Motion interchangeably uses the terms "ammunition" and "firearm," since both are criminalized under 18 U.S.C. § 922(n).

8.      Pursuant to *Bruen* and *Quiroz*, Tohme moves to dismiss his 18 U.S.C. § 922(n) indictment.

## ARGUMENT

Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R. CRIM. P. 12(b)(1). If a pretrial motion presents a question of law in a case involving undisputed facts, Rule 12 authorizes the Court to rule on the motion. *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *see* FED. R. CRIM. P. 12(d) (permitting the Court to rule on a motion involving factual issues provided the Court states its essential findings on the record); *see also*, *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) ("a pretrial dismissal is essentially a determination that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt."). Otherwise, the court would waste resources by allowing a case to proceed to trial and later dismissing it based on the same legal argument and facts presented through a pretrial motion. *Flores*, 404 F.3d at 325. Specifically, Rule 12(b)(3)(B)(v) allows pretrial challenges to indictments that "fail[] to state an offense." As a matter of law, the indictment fails to state an offense because Tohme's indictment status was not material to the lawful purchase of the ammunition, required by the § 922(n) charge, since any prohibition on indictees receiving ammunition is unconstitutional. *See United States v. Holden*, —— F.Supp.3d ——, No. 3:22-CR-30 RLM-MGG, 2022 WL 17103509, at *7-9 (N.D. Ind. Oct. 31, 2022) (so holding).

First, § 922(n) violates the Second Amendment. Possession—and thus necessarily receipt—of ammunition commonly used for self-defense is the most clearly protected conduct by the plain text of the Second Amendment. And there is no historical tradition from the founding era of criminalizing receipt of ammunition while under indictment.

### 1) Bruen established a new analytical framework for analyzing Second Amendment challenges.

The Second Amendment to the United States Constitution mandates that a "well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codified an individual right to possess and carry weapons, and explained that the inherent right of self-defense, particularly in the home, is central to the right. 554 U.S. 570, 628 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (holding "that individual self-defense is the central component of the Second Amendment right"). The right, however, is not unlimited, and the Supreme Court acknowledged the legitimacy of "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 544 U.S. at 626–27.

Following *Heller*, the Fifth Circuit "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). First, courts would ask "whether the conduct at issue falls within the scope of the Second Amendment right." *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives [NRA]*, 700 F.3d 185, 194 (5th Cir. 2012)). If the conduct was outside the scope of the Second Amendment, then the law was constitutional. *McGinnis*, 956 F.3d at 754. If not, courts proceeded to the second step, using means-end scrutiny to analyze the law in question. *Id.*

*Bruen* extended the right articulated in *Heller*: The Second Amendment protects the individual right to possess and carry a firearm not just in the home, but also in public. 142 S. Ct. at 2122. In reaching this holding, the Supreme Court announced a new framework for analyzing Second Amendment claims, which abrogates the two-step inquiry adopted by the Fifth Circuit. *Id.* at 2126–27, 2127 n.4. While the Supreme Court rejected the second step of that framework, it reasoned that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. Under *Bruen*'s new framework "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. This is all that a defendant must show. It then becomes the government's burden to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside of the Second Amendment's 'unqualified command.'" *Id.* (cleaned up).

Section 922(n)'s prohibition fails to state an offense, because § 922(n) is unconstitutional for two independent reasons.

**2) Section 922(n) is unconstitutional under *Bruen*.**

*A) Under Bruen, the Second Amendment's plain text covers conduct under § 922(n), so § 922(n) is presumptively unconstitutional.*

Under *Bruen*'s new framework, courts must first determine if the Second Amendment's plain text covers an individual's conduct. 142 S. Ct. at 2129–30. If so, the Constitution presumptively protects the conduct. *Id.*

The plain text of the Second Amendment covers conduct under § 922(n). This analysis is simple and straightforward. "Receiving a firearm is necessarily a precursor to keeping or bearing a firearm, so [Tohme's] conduct is presumptively protected by the Second Amendment." *United States v. Holden*, —— F.Supp.3d ——, No. 3:22-CR-30 RLM-MGG, 2022 WL 17103509, at *3 (N.D. Ind. Oct. 31, 2022) (holding Second Amendment protects conduct covered in § 922(n)) (citations omitted); *see also United States v. Stambaugh*, —— F.Supp.3d ——, No. CR-22-00218-PRW-2, 2022 WL 16936043, at *3 (W.D. Okla. Nov. 14, 2022) ("receipt is the condition precedent to keeping and bearing arms"); *United States v. Quiroz*, —— F.Supp.3d ——, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *3–4 (W.D. Tex. Sept. 19, 2022) (holding that "to keep and bear Arms" includes receiving arms under § 922(n)); *United States v. Hicks*, —— F.Supp.3d ——, No. W:21-CR-00060-ADA, 2023 WL 164170, at *2–3 (W.D. Tex. Jan. 9, 2023) (relying on *Quiroz* to reach the same conclusion).[3]

The government may claim that Tohme's status—as an indictee—means he is not part of "the people" covered by the Second Amendment's text, noting that *Bruen* referred to the plaintiffs as "law-abiding," 142 S. Ct. at 2125, and that dicta in *Heller* suggested felons could be barred from possessing firearms, *see* 554 U.S. at 626–27. But this argument conflates *Bruen*'s first step with its second: "the Second Amendment's plain text must cover 'receipt' of a firearm. *Bruen*'s second step would analyze 'persons under indictment.'" *Quiroz*, —— F.Supp.3d at ——, 2022 WL 4352482, at *3 (citing *Kanter v. Barr*, 919 F.3d 437, 451–52 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111)). And regardless, neither *Bruen* nor *Heller* "explicitly nor implicitly removes those merely *accused* of a felony by a grand jury from 'the

---

[3] Both *Quiroz* and *Hicks* are on appeal. *Hicks* is a new appeal and has not yet been briefed, but *Quiroz* (No. 22-50834) has, and it is set for oral argument on 8 February 2023 in the morning.

people' entitled to the protection of the Second Amendment.'" *Stambaugh*, —— F.Supp.3d at ——

–, 2022 WL 16936043, at *2 (emphasis in original). Indeed, "unlike the historical tradition of

excluding [certain individuals] from the rights of 'the people,' little evidence supports excluding

those under indictment in any context." *Quiroz*, —— F.Supp.3d ——, 2022 WL 4352482, at *10;

*see also United States v. Laurent*, 861 F. Supp. 71, 102 (E.D.N.Y. 2011) ("a defendant under

indictment is a 'law-abiding citizen' who remains eligible for Second Amendment protection.");

*United States v. Love*, 20-cr-20327, 2021 WL 5758940, at *3 (E.D. Mich. Dec. 3, 2021) ("The

purchase of a firearm by a presumably innocent individual falls within the Second Amendment

right as historically understood."). The first step analysis can end here. *See Hicks*, —— F.Supp.3d

——, 2023 WL 164170, at *2–3.

   If the analysis were to continue, though, Tohme's case for unconstitutionality only grows

stronger. Section 922(n) bars all ammunition transfer or receipt by an individual merely under

indictment for any offense punishable by over a year in prison. The statute is not limited by the

type of ammunition or the purpose for which the ammunition might be used. Nor is it limited by

the place of receipt, applying equally to a person's receipt of ammunition in their home or public

space. Because of the broad prohibition on receipt of all ammunition in the home and in public,

the conduct prohibited under § 922(n) involves "weapons 'in common use' today for self-defense."

*Bruen*, 142 S. Ct. at 2134 (citing *Heller*, 554 U.S. at 627). Under the statute, law-abiding citizens

can be denied their Second Amendment rights and even imprisoned, simply because they are

accused—but not convicted—of a crime. The underlying indictment need not be for a violent

offense and need not be accompanied by any determination of dangerousness or other meaningful

process. Thus, § 922(n) clearly encroaches on the right to possess and carry a firearm and

ammunition in the home and public[4] and upends the longstanding presumption of innocence, all of which is inconsistent with the historical traditions of the Second Amendment and the Constitution more broadly.

Because the plain text of the Second Amendment covers the conduct regulated under § 922(n), the law is presumptively unconstitutional. *See Bruen*, 142 S. Ct. at 2129–30.

> B) *The government must show that § 922(n)'s ammunition restrictions are "consistent*
> *with the Nation's historical tradition of firearm regulation." It cannot.*

Under *Bruen*, when the plain text of the Second Amendment covers the conduct at issue, the burden shifts to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The government cannot sustain its burden.

To meet its burden, the Government must provide historical examples and support for the constitutionality of § 922(n), and the Court is "entitled to decide a case based on the historical record compiled by the parties," rather than conducting its own historical surveys. *See id*. at 2130 n.6; *see also id*. at 2150 ("Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). The Government cannot rely on a select few "outlier" regulations; it must show "a tradition of broadly prohibiting" conduct in the manner of § 922(n). *See id*. at 2138, 2156. There is no such historical tradition of depriving an individual of their Second Amendment right based solely on an indictment.

---

[4] In passing § 922, Congress assuaged its Second Amendment concerns by assuming that the Second Amendment did not confer an individual right to bear arms. *See* 1968 U.S.C.C.A.N. 2112, 2169 (Senate Report stating that courts "hold that the second amendment, unlike the first, *was not adopted with the individual rights in mind*, but is a prohibition upon Federal action which would interfere with the organization of militia by the states of the Union") (emphasis added). This position was rejected by the Supreme Court in *Heller* and *Bruen*.

*Bruen* explained that "when it comes to interpreting the Constitution, not all history is created equal. Thus, constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35). "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions change in the intervening years." *Id.*[5] Similarly, *Bruen* stated that "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* The Court expressed skepticism about reliance on laws passed long after the passage of the Second Amendment, instructing that "to the extent later history contradicts what the text says, the text controls." *Id.* at 2137.

The Court also explained that the requisite similarity between the challenged law and historical examples in part depends on whether the problem addressed by the law is longstanding or uniquely modern. *Id.* at 2131–33. When "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. The total handgun ban in *Heller* and the public-carry restrictions in *Bruen* involved this type of straightforward historical inquiry. *Id.* But "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132. "When confronting such present-day firearm regulations,

---

[5] The Fourteenth Amendment was specifically implicated in *Bruen* because it is the Fourteenth Amendment that imposes the Second Amendment's pronouncement on a state regulation or law. The Supreme Court left open the question of whether the proper time-period to consider, particularly for a federal statute, is 1791, the passage of the Second Amendment, or 1868, the passage of the Fourteenth Amendment. *See Bruen*, 142 S. Ct. at 2137–38; *id.* at 2163 (Barret, J., concurring). But the Court acknowledged that 19th century evidence was secondary to that from the nation's founding, *see id.* at 2137, and its value is likely even more limited when addressing a federal statute. The government cannot meet its burden under either timeframe.

this historical inquiry that courts must conduct will often involve reasoning by analogy . . ." *Id*. Whether an historical regulation is a proper analogue for a uniquely modern regulation turns on whether they are "relevantly similar," based in part on how and why the regulations burden the Second Amendment right. *Id*. at 2132–33.

Here, as in *Heller* and *Bruen*, historical examples of regulations proffered by the government must be "distinctly similar" to § 922(n) because the restriction imposed by this statute does not address "unprecedented societal concerns or dramatic technological changes[.]" *Id.* at 2132–33. Rather, § 922(n) creates a total ban on ammunition receipt, based on an indictment, a process older than—and expressly discussed in—the Fifth Amendment. *See* U.S. Const. amend. V.

The Government cannot meet its burden to show that the Nation's history, particularly in the late 18th century, supports ammunition restrictions for individuals under indictment or "distinctly similar" restrictions. "Indictment has historically had a limited effect on an individual's constitutional rights." *Laurent*, 861 F. Supp. 2d at 91. And the impact on an indicted person's rights has generally been limited to detention or certain pre-trial conditions only after a judicial determination that such conditions are necessary. *Id.* at 90–93 (citing *United States v. Salerno*, 481 U.S 739, 764 (1987); 18 U.S.C. § 3142).

Conversely, the history of barring indicted individuals from receiving ammunition is limited and recent. Congress first passed a law prohibiting transporting firearm for individuals under indictment for a crime of violence, in 1938. *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed). It was not until 1961 that Congress expanded the prohibition to include all individuals under indictment. *See* Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757 (repealed). The statute was again clarified in 1968, to include indictments in state and federal

court, but only for those felonies punishable by more than one year in prison. *See* Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928).

The Government cannot rely on the passage of § 922(n) in the mid-20th century to establish a long-standing historical tradition back to the enactment of the Second Amendment, particularly where it contradicts the Second Amendment's plain language. *See Bruen*, 142 S. Ct. at 2136–37. The Supreme Court specifically declined to consider any 20th century evidence offered by the respondents in *Bruen*, noting it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28. Indeed, after *Bruen*, courts have likewise rejected the government's attempts to rely on passage of § 922(n) to show that it comports with history linked back to the Second Amendment's enactment. "From 1791 to 1938 is wide enough a gulf that the Federal Firearms Act of 1938 doesn't shed much light on the original public meaning of the Second Amendment." *Holden*, —— F.Supp.3d at ——, 2022 WL 17103509, at *3 (citing *United States v. Quiroz*, —— F.Supp.3d at ——, 2022 WL 4352482, at *5 ("Yet the Government fails to explain why regulations enacted less than a century ago count as 'longstanding.'")). Similarly, state laws aimed at ammunition or firearm receipt or possession by persons under indictment were enacted largely in the 20th century and tend to be less restrictive than § 922(n).[6] The lack of "distinctly similar historical regulation" barring ammunition receipt for individuals under indictment, particularly prior to the 20th century, demonstrates that § 922(n) is inconsistent with the Second Amendment. *See Bruen*, 142 S. Ct. at 2131.

---

[6] *See, e.g.*, Ohio Rev. Code Ann. § 2923.13(A)(2), (3) (passed in 1972 and limited to those under indictment for "offense of violence" or certain other enumerated offenses); Wash. Rev. Code § 9.41.040(2)(a)(iv) (added in 1996 and requiring those on bond pending trial for serious offenses to surrender firearms); Haw. Rev. Stat. Ann. § 134-7 (passed in 1988). *See also Potts v. State*, 526 So. 2d 104, 104 (Fla. Dist. Ct. App. 1987), *approved*, 526 So. 2d 63 (Fla. 1988) (finding statute restricting use and concealed carry of firearms by those under indictment violated state constitution).

Even if § 922(n) were a uniquely modern regulation, such that the Court could expand its historical analysis to include merely similar historical analogues, there is limited support for restricting firearms or ammunition for individuals under indictment. The *Heller* Court acknowledged that presumptively lawful regulatory measures include "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27. Even if the Court were to assume sufficient historical evidence for those restrictions, the government could prove § 922(n)'s consistency with historical tradition only if those types of restrictions were found to be "relevantly similar," by looking to how and why the regulations burden the Second Amendment right. *See Bruen*, 142 S. Ct. at 2132–33.

But the Government cannot rely on general public safety justifications to uphold § 922(n). The examples provided by *Heller* generally all comport with the historical principle of disarming select groups for the sake of public safety. *See NRA*, 700 F.3d at 200–01 (citing Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 231–36 (1999)); *see also Kanter*, 919 F.3d at 453–64 (Barrett, J., dissenting) (explaining that history does not support restricting firearms for felons categorically, but rather for categories of people deemed dangerous). The same inherent threat to public safety is not present in a § 922(n) case,[7] particularly because

---

[7] *See Potts*, 526 So. 2d at 104 (striking down Florida statute restricting firearm rights for individuals under indictment, and noting, "[i]f an individual is presumed innocent until proven guilty, … how can it validly be assumed that individuals 'under indictment' necessarily present a greater risk to society than other citizens?").

the statute is not limited to individuals under indictment for violent or firearms offenses[8] and does not require an individualized determination of dangerousness.[9] The Supreme Court has since explained that the "government may not simply posit that the regulation promotes an important interest." *Bruen*, 142 S. Ct. at 2126.

Just as in *Quiroz*, *Hicks*, *Holden*, and *Staumbaugh*, the government cannot—and will not—meet its burden to show that § 922(n) is consistent with the Nation's historical tradition of ammunition and firearm regulation.

\* \* \*

*Bruen*'s new analytical framework plainly applies to § 922(n), and that framework renders the statute unconstitutional under the Second Amendment. The *Bruen* Court drew no distinction between as-applied and facial challenges under the Second Amendment; in fact, neither term appears anywhere in the majority opinion. Nevertheless, under *Bruen*, § 922(n) is unconstitutional

---

[8] Pre-*Bruen*, courts upheld portions of § 922 that restricted gun ownership for individuals convicted of non-violent crimes. *See, e.g.*, *Folajitar v. Att'y Gen. U.S. of Am.*, 980 F.3d 897 (3d Cir. 2020). But those cases applied the now-defunct two-part framework, and several circuits left open the possibility of as-applied or overbreadth challenges for certain non-violent convictions. *See, e.g.*, *United States v. Williams*, 616 F.3d 685, 693 (7th Cir. 2010). And regardless, any historical basis for restricting the Second Amendment rights of individuals convicted of even non-violent crimes has limited application for people who have been simply indicted.

[9] For similar reasons, this Court should not look to historical surety statutes as analogues. The *Bruen* Court addressed a series of mid-19th century statutes requiring certain dangerous individuals to post bond before carrying weapons in public. 142 S. Ct. at 2148. Such statutes are easily distinguishable because they only limit public carry, provide for the carrier to post bond to carry firearms, and are limited to those individuals found to pose a *specific* threat. *See id.* at 2148–50. The Court in *Bruen* further explained that such statutes were of limited historical value because of the dearth of evidence that authorities ever enforced them. *Id.* at 2149. Further, the surety statutes were enacted well after the Second Amendment's ratification, they were not even widely adopted, and they provided much more process for individuals than § 922(n). *See Stambaugh*, —— F.Supp.3d at ——, 2022 WL 16936043, at *3–5. So some courts have rightly rejected these attempts to invoke these surety statutes to save § 922(n) under *Bruen*'s second step. *See id.*; *Holden*, —— F.Supp.3d at ——, 2022 WL 17103509, at *4; *Quiroz*, —— F.Supp.3d at ——, 2022 WL 4352482, at *7-8; *Hicks*, —— F.Supp.3d at ——, 2023 WL 164170, at *7.

on its face. *See United States v. McGinnis*, 956 F.3d 747, 752 (5th Cir. 2020) (explaining facial challenges). And it is unconstitutional—by way of § 922(a)(6)—in this case. *See Binderup v. Att'y General United States of America*, 836 F.3d 336, 345 (3d Cir. 2016) (explaining as-applied challenges). The plain text of the Second Amendment protects possession and receipt of a firearm and ammunition for self-defense, and there is no founding-era historical tradition criminalizing receiving firearms or ammunition while under indictment. Section 922(n) violates the Second Amendment.

### 3) Regardless, § 922(n) is also unconstitutional because it violates Tohme's Fifth Amendment due process rights.

Alternatively and additionally, § 922(n) violates Tohme's due process rights under the Fifth Amendment. Section 922(n) is the vehicle through which Tohme is deprived of several constitutional rights and liberties, despite being predicated only on a state indictment devoid of meaningful procedural protections.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. V. "When the government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. This requirement has traditionally been referred to as 'procedural due process.'" *United States v. Salerno,* 481 U.S. 739, 746 (1987) (citing *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)). Courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the Government; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 460 (1989) (cleaned up).

Start with the first step: the government has interfered with a liberty or property interest. Section 922(n) has barred Tohme from receiving a firearm or ammunition—for several years—in violation of his Second Amendment rights. Indeed, several courts have recognized that pretrial firearm restrictions constitute a deprivation under step one of the due process test. *See, e.g., United States v. Arzberger*, 592 F. Supp. 2d 590, 601-02 (S.D.N.Y. 2008). Further, § 922(n) criminalizes the mere fact of exercising one's constitutional rights while under indictment, so it also implicates Tohme's right to presumed innocence. "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895). Finally, Tohme faces losing his most fundamental liberties if imprisoned for this offense, all based on his having been indicted in state court. Freedom from undue incarceration or bodily restraint has historically been recognized as the core liberty interest to be protected by the Due Process Clause. *See Ingraham v. Wright*, 430 U.S. 651, 673-74 (1977).

Because § 922(n) involves a deprivation of several of Tohme's liberties, the Court must analyze the appropriate process due under the balancing test set out in *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). At the outset, § 922(n) represents a unique due process issue. Typically, a due process analysis would involve looking at the potential loss of liberty and the process afforded by a single given statute or regulation. *See, e.g., See, e.g., United States v. Torres*, 566 F. Supp. 2d 591 (W.D. Tex. 2008). Here, however, the statutory scheme of § 922(n) necessarily relies on a patchwork of other legal frameworks, because the deprivation can be predicated on a state court indictment. It is not enough simply to consider the process afforded to a defendant accused under § 922(n) or § 922(a)(6). Rather, one must consider the process given to individuals who have been indicted, even before they are charged under § 922(n) or § 922(a)(6). These individuals are

deprived of their right to bear arms, their right to presumed innocence, and potentially their basic liberty if incarcerated, based on an indictment, the process for which almost never involves any opportunity for a defendant to respond before the federal charge. There was certainly no such opportunity here. In spite of these complications, one can still analyze the statute within the *Mathews v. Eldridge* framework.

In *Mathews v. Eldridge*, the Supreme Court announced a three-factor balancing test for assessing the specific process necessary when a liberty interest is implicated. 424 U.S. at 334. Courts must weigh: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* Section 922(n) fails this test.

In *United States v. Torres*, Judge Cardone found the Adam Walsh Amendments' mandatory pretrial release conditions for those charged with certain offenses, including failure to register as a sex offender, violated due process. 566 F. Supp. 2d 591 (W.D. Tex. 2008). Applying the *Mathews v. Eldridge* balancing test, the court reasoned that the mandatory conditions, specifically electronic monitoring and curfew conditions, implicated significant liberty interests. *See id.* at 596-97. The court further found that the "risk of erroneous deprivation" was manifest, because absent a judicial determination about such conditions, there would be no way of knowing if the deprivation was ever erroneous or warranted. *See id.* at 597-98. To the third factor, the court explained that procedural safeguards like permitting the court to consider the defendant's circumstances in setting conditions of pretrial release, would remove much of those risks, with minimal burden on the government. *See id.* at 598. Importantly, the court noted that while the

government's interest in protecting children was important, "it is not clear to the Court how removing from judicial consideration whether a curfew with electric monitoring is necessary to secure the safety of the community and of children improves that interest." *Id*.

Shortly after the ruling in *Torres*, a court in the Southern District of New York denied the imposition of the specific Adam Walsh Amendment provision restricting firearms. *See Arzberger*, 592 F. Supp. 2d 590. The court in *Arzberger* explained that the mandatory pretrial release condition prohibiting firearm possession implicated the newly recognized individual Second Amendment right from *Heller*. *See Arzberger*, 592 F. Supp.2d at 602. As explained in *Arzberger*, "although the Supreme Court has indicated that this privilege may be withdrawn from some groups of persons such as convicted felons, there is no basis for categorically depriving persons who are merely accused of certain crimes of the right to legal possession of a firearm." *Id*. Following *Mathews v. Eldridge*, the court reasoned that the absence of any individualized determination for the pretrial condition made a wrongful deprivation a serious risk. *Id*. at 602-03. The court noted "[i]ndeed, the Government may well find it difficult to articulate a nexus between an accusation of receiving child pornography and the need to prohibit possession of a firearm." *Id*. at 603. Ultimately, the court reasoned, as in *Torres*, that the added process of requiring independent judicial determination would not undermine the government's interest in community safety. *Id*.

Tohme's case presents substantially similar issues as in *Torres* and *Arzberger*. By conditioning a deprivation of his liberties on a mere indictment, without any judicial consideration or other process, § 922(n) violates due process. Weighing the first *Mathews* factor, the private interest here—i.e., the Second Amendment deprivation, loss of the presumption of innocence, and incarceration—is paramount, as described above. *See Mathews*, 424 U.S. at 334. Section 922(n) effectively imposes a mandatory pretrial condition limiting firearms or ammunition for any person

indicted in any jurisdiction for any crime punishable by more than a year. And the liberty interests are even greater for Tohme than those in *Torres* and *Arzberger*, because of the added possibility of significant prison time for a conviction premised solely on indicted conduct.[10]

On the second factor, there are considerable risks of erroneous deprivation, because of the complete absence of procedural safeguards. *See Mathews*, 424 U.S. at 334. Tohme's alleged receipt of ammunition has been labelled a federal crime by sheer virtue of a state indictment. He could, of course, be found not guilty of those state charges, but still be subject to this federal statute. Even worse, the state indictment and the provisions of § 922(n) include no specific determination of his dangerousness, no consideration of the nature of the charged crime, and no involvement by Tohme in his underlying indictment. Those who are merely under indictment for conduct do not participate in those proceedings nor do they have an ability to challenge their status. *See generally* TEX. CODE OF CRIM. P. Ch. 20A, Grand Jury Proceedings. There is simply no meaningful process afforded to Tohme. As in *Torres* and *Arzberger*, the issue has less to do with a quantifiable risk of erroneous deprivation, but more to do with the inability to ever assess any error because of the absence of any process at all. *See Torres*, 566 F. Supp. 2d at 597-98.

The third *Mathews* factor also weighs in favor of finding a due process violation. The government's interest in enforcing § 922(n) is minimal. As opposed to firearm prohibitions based on felony convictions or specific assessments about dangerousness, barring a person from receiving a firearm or ammunition while indicted—for any felony at all—is ill-tailored to the government's interest in public safety. Nor would further procedural protections—like an

---

[10] Of course, the defendants in *Torres* and *Arzberger* faced possible prison time as well, if convicted of the crimes with which they were ultimately federally indicted. Tohme, on the other hand, could face federal prison time without ever receiving a trial on the underlying state conduct for which he has been indicted, and which serves as a predicate for § 922(n).

individualized hearing on dangerousness or a requirement that a person be convicted—unduly burden the government. In fact, as in *Torres* and *Arzberger*, such provisions would undoubtedly better serve the public.

Section 922(n) deprives Tohme of due process under the Fifth Amendment.

As a pure matter of law, the sole count in the indictment fails to state an offense, and the Court should dismiss it.

## CONCLUSION

The government alleges that Tohme was under indictment when he tried to buy ammunition. But, indictment status is irrelevant to the lawful purchase of ammunition because § 922(n)—criminalizing receiving ammunition while under indictment—is unconstitutional. This sole charge fails to state on offense. Accordingly, the Court should dismiss the indictment. Tohme also prays for all other relief to which he is entitled in both equity and law.

<div style="margin-left: 40%;">

Respectfully submitted,
Valenzuela Law Firm
701 Magoffin Avenue
El Paso, Texas 79901
 (915) 209-2719
 (915) 493-2404 fax

By:    /s/ Felix Valenzuela
       State Bar No. 24076745
       felix@valenzuela-law.com
       Attorney for Defendant

</div>

## **CERTIFICATE OF SERVICE**

      I hereby certify that, on February 21, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which shall send notification of such filing to the following: catherine.dos.santos@usdoj.gov.

                  _/s/ Felix Valenzuela_____

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISON**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CAUSE NO. EP:22-CR-1944-KC** |
| | § | |
| **DANIEL TOHME POSADA,** | § | |
|    **Defendant.** | § | |

## <u>ORDER</u>

On this day, the Court considered Defendant's Motion to Dismiss the Indictment, and the

Court is of the opinion that the motion should be GRANTED. Accordingly, it is hereby:

ORDERED that the Indictment in this cause is DISMISSED.

SIGNED this ____ day of _____, 2023.


_____
**KATHLEEN CARDONE**
**UNITED STATES DISTRICT JUDGE**